**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KAREN SUE MEYER,**

**Plaintiff,** :

**v.**

**JPMORGAN CHASE BANK N.A.,** :

**Defendant.**

**Case No. 2:23-cv-3720**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

**OPINION AND ORDER**

Karen Sue Meyer worked for JPMorgan Chase Bank N.A. ("JPMC") for over thirty years. After she tried to split a customer transaction into smaller amounts to bypass an internal banking system's request for authentication, JPMC terminated her. Believing her termination was the result of her supervisor's ageist animus, Ms. Meyer sued JPMC under the Age Discrimination in Employment Act ("ADEA") and Ohio law. JPMC moved for summary judgment. (Mot., ECF No. 49.) That Motion is ripe and, for the reasons below, is **GRANTED**.

## I. STATEMENT OF THE FACTS

### A. Ms. Meyer's Employment with JPMC

Ms. Meyer began working at JPMC in 1988, working as a bank teller at the Delaware, Ohio branch for most of her career. (Pl.'s Dep., ECF No. 37-1, PAGEID # 154.) At some point, the teller role was converted to an "associate banker" position. An associate banker largely performs the same duties as a teller, but the position integrates the use of digital applications. (Pl.'s Dep., PAGEID # 156.)

In 2018, Marena Muzillo took over as the manager of the Delaware Branch. Ms. Muzillo and Ms. Meyer generally had no issues in their working relationship. (*See* ECF No. 40-1, PAGEID # 868.) Ms. Muzillo gave Ms. Meyer consistently positive annual performance evaluations, remarking that Ms. Meyer was a "strong" and "highly dependable" employee. (*See* ECF No. 38-1, PAGEID ## 664–71.) She also commended Ms. Meyer for her loyal client base and commitment to serving her clients. (*Id.*, PAGEID ## 665–66.) Still, Ms. Muzillo used the annual reviews to highlight areas for improvement, including a need to embrace the evolving nature of the associate banker role. (*Id.*, PAGEID # 670.) Ms. Muzillo worked with Ms. Meyer individually to improve her technology skills and to help her adapt to the integration of digital devices. (Pl.'s Dep., PAGEID # 240.)

On a few occasions, Ms. Muzillo coached Ms. Meyer regarding her performance. For example, in 2019, Ms. Meyer violated company policy when she left the keys for the ATM vault in a customer-facing area; Ms. Muzillo gave her a verbal warning for this violation. (Pl.'s Dep., PAGEID ## 242, 244.) Ms. Muzillo also coached Ms. Meyer for violating company policy after she left the ATM vault unlocked and, on a separate occasion, after she walked away from a transaction line with her coin locker unsecured. (*Id.*, PAGEID ## 243–45.) Beyond the verbal warning in 2019, Ms. Meyer received no other formal discipline before her termination.

In December 2020, Ms. Muzillo reported concerns about Ms. Meyer's performance to JPMC's Employee Relations ("ER") unit. According to Ms. Muzillo,

Ms. Meyer was a "great performer 'on paper,'" but her "bad attitude" and "resistance" to the changes to the associate banker role were impacting her performance. (ECF No. 60-2, PAGEID ## 3234–35.) Specifically:

> [Ms. Meyer] has been in the role for a long time, and may not be adapting to the other Associate Banker responsibilities outside of quickly servicing the client. For example, the [associate bankers] are supposed to document a client's account after the transaction which may result in a client waiting an additional time, and [Ms. Meyer] is so client centric focused that she doesn't like to take these additional steps (which are procedure) as it delays servicing the next client. … [D]ue to [Ms. Meyer's] antiquated way of viewing her role, there has [*sic*] been reports of her being perceived as negative, which has reduced branch morale.

(*Id.*, PAGEID # 3235.) Ms. Muzillo told ER that she did not want to take corrective action against Ms. Meyer because Ms. Meyer had improved through coaching and she believed that additional feedback would "be enough to turn the behavior around." (*Id.*)

### B. Teller Express System

This dispute centers primarily on Ms. Meyer's use of JPMC's internal banking system, the Teller Express ("TE") System. Employees use the TE System to verify a customer's identity. After initiating a transaction, the TE System prompts the employee for the appropriate form of identification to authenticate the customer. (Cheeseman Dep., ECF No. 42-1, PAGEID ## 1114–15; ECF No. 39-1, PAGEID # 762.) The required form of identification depends on the nature of the transaction. For example, withdrawals of over $2,000 require the customer to present a primary and secondary ID for authentication. (Authentication Policy, ECF No. 38-1, PAGEID # 616; *see also* Pl.'s Dep., PAGEID # 164.) JPMC's policy enumerates the specific IDs that are sufficient to authenticate a customer for a

specific transaction. (Authentication Policy, PAGEID # 617.) As a general matter, employees use the TE System's prompts for the form of authentication required, but they could also access JPMC's authentication policies and procedures from their TE System terminal at any time for guidance. (Pl.'s Dep., PAGEID # 168; Cheeseman Dep., PAGEID # 1117; Guthrie Dep., ECF No. 50-1, PAGEID ## 2397–99.)

For some transactions, the TE System requires the customer to present a debit card and use a PIN pad connected to the TE System for authentication. If a customer does not have his debit card, the employee should contact her branch manager for assistance or ask the customer to return with the debit card. (Guthrie Dep., PAGEID # 2399; Authentication Policy, PAGEID # 616.) Alternatively, the employee can authenticate the customer by sending a one-time passcode to the customer's mobile device, though the only system capable of sending such a code at the Delaware Branch was located at the drive-through window. (Pl.'s Dep., PAGEID ## 177–78, 190–91; Authentication Policy, PAGEID # 618.) If the PIN pad was not working, the employee could disconnect the PIN pad and authenticate the customer using a different method under the policy, or she could ask another associate to run the transaction. (Guthrie Dep., PAGEID # 2398; *see also* Authentication Policy, PAGEID # 618.)

Sometimes, the TE System would not allow an employee to override a request for debit-card authorization when the customer did not have his card, but he otherwise had sufficient ID for authentication under the policy. (Cheeseman Dep., PAGEID ## 1119–20.) Jessica Cheeseman (whose role at the time was lead

associate operations) contacted JPMC's banking support line regarding this issue and was instructed to unplug the PIN pad when it was not working properly as a "temporary solution." (*Id.*, PAGEID # 1120.) Ms. Cheeseman told the other branch employees about this PIN-pad workaround. (*Id.*, PAGEID ## 1123–24; Guthrie Dep., PAGEID # 2398.)

### C. June 2021 Transaction and Investigation

In June 2021, Ms. Meyer assisted a customer who wanted to withdraw money to buy a boat. (ECF No. 39-1, PAGEID # 750.) The customer asked to cash a check for $8,000, but he did not have sufficient funds in his account to cover that amount. (*Id.*, PAGEID # 739.) He then deposited the check and asked to withdraw $5,000. When Ms. Meyer tried to complete the withdrawal, the TE System prompted her to authenticate the customer's identity with his debit card. (Pl's Dep., PAGEID # 172.) The customer did not have his debit card, so the TE System would not allow Ms. Meyer to complete the transaction. (*Id.*, PAGEID ## 171–173.)

Ms. Meyer then attempted to split the transaction into three separate withdrawals under $2,000. She believed that lower withdrawal amounts would not trigger the TE System's prompt for additional authentication and would allow her to complete the transaction without the customer's debit card. (*Id.*, PAGEID ## 172–73; 192.) Indeed, the customer had a photo ID and withdrawals under $2,000 only require a primary ID for authentication. (*Id.*, PAGEID ## 171–72; Authentication Policy, PAGEID # 616.) Still, the TE System denied the split transaction. (Pl.'s Dep., PAGEID ## 173, 175–76.) Ms. Meyer then spoke with Ms.

Muzillo, and Ms. Muzillo completed the entire $5,000 withdrawal after authenticating the customer through a one-time pass code sent to his cell phone.

Ms. Muzillo reported the attempted split transaction to Global Security ("GS"), which investigates fraud-related misconduct, alleging that Ms. Meyer "manipulated" the TE System by splitting the transaction into three smaller withdrawals to avoid the prompted authentication method. (Courtade Dep., ECF No. 39-1, PAGEID # 694; ECF No. 39-1, PAGEID # 733.) And, when interviewed by GS, Ms. Meyer admitted that she had tried to split the withdrawal into lower amounts to avoid the required authentication; she said she was only trying to help the customer, who needed to complete the transaction quickly because the seller of the boat was with him in line. (ECF No. 39-1, PAGEID ## 738–39.) GS did not find that Ms. Meyer attempted to "manipulate the system," but it determined that Ms. Meyer violated JMPC's policy on maintaining accurate records. (*Id.*, PAGEID # 745; Courtade Dep., PAGEID ## 708–09.)

ER then reviewed GS's findings. The initial ER investigator recommended coaching for Ms. Meyer. (ECF No. 38-1, PAGEID # 678.) However, after reviewing the initial investigation and speaking with Ms. Muzillo, ER Team Manager Pamela Mayer recommended that Ms. Meyer be issued a written warning because she admitted to a "serious" violation. (ECF No. 40-1, PAGEID # 859; Mayer Dep., PAGEID # 817.)

Ms. Muzillo believed that a written warning was insufficient to hold Ms. Meyer accountable, so she consulted with Ms. Mayer, Jeremy Young (her

supervisor), and Eddie Kasang (ER Partner) regarding potential termination. (Muzillo Dep., PAGEID ## 498–501, 504.) Although Ms. Meyer's past performance issues were considered, Ms. Muzillo determined, and the others agreed, that splitting a transaction to avoid triggering authentication prompts put customers and the bank at "significant risk" and warranted termination. (Mayer Dep., PAGEID ## 821–27; Muzillo Dep., PAGEID ## 491-92; ECF No. 39-1, PAGEID # 766.) They also believed that her lengthy tenure at the bank made her conduct more egregious, because her experience and knowledge meant that she should have known better but she chose to circumvent company procedures anyway. (Muzillo Dep., PAGEID # 501; *see also* Mayer Dep., PAGEID # 829.)

JPMC terminated Ms. Meyer for unsatisfactory performance. (ECF No. 39-1, PAGEID # 766; Muzillo Dep., PAGEID ## 506–07.)

**D. Subsequent Investigations**

Ms. Meyer contested her termination and asked to be reinstated. (Pl.'s Dep., PAGEID ## 211–12; ECF No. 40-1, PAGEID ## 873–79.) After reviewing the decision and speaking with Mmes. Meyer and Muzillo, a different ER investigator found that termination was appropriate because Ms. Meyer admitted to conduct that violated company policy. (ECF No. 40-1, PAGEID # 874.) When the ER investigator told Ms. Meyer that her termination would stand, she said that she felt like she was being "targeted" and "discriminated against because of [her] age." (*Id.*)

Ms. Meyer's age-discrimination complaint prompted an additional ER investigation. This investigator asked Ms. Meyer if anyone at JPMC said something that made her believe her termination was because of her age; Ms. Meyer said no.

(ECF No. 40-1, PAGEID # 868.) Instead, she reported that she felt "discriminated against" because she knew "others who try to go around the system and they are still employed[.]" (*Id.*, PAGEID # 861.) The investigator concluded that Ms. Meyer's discrimination complaint was unsupported and closed the case. (*Id.*, PAGEID # 872.)

Ms. Meyer then initiated this lawsuit, asserting age-discrimination claims against JPMC under the ADEA and Ohio Revised Code § 4112.02(A).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.

1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

Age-discrimination claims under the ADEA and Ohio law are analytically similar, so the Court analyzes them together. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) ("Under Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis."). To succeed on an age-discrimination claim, a plaintiff must show that age was the "but-for" cause of an adverse employment decision. *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 894 (6th Cir. 2024) (citation omitted).

When, such as here, the plaintiff offers only circumstantial evidence of age discrimination, courts evaluate the claims using the *McDonnell Douglas* burden-shifting framework. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). First, the plaintiff must establish a prima facie case of discrimination. *Id*. To do so, she must demonstrate that she (1) was older than forty years old; (2) suffered an adverse employment action; (3) was qualified for her position; and (4) was replaced by a younger employee or similarly situated younger employees were treated more favorably. *McNeal*, 117 F.4th at 895. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. *Id*. The burden then shifts back to

the plaintiff to demonstrate that the proffered reason is pretext for age discrimination. *Id.* To survive summary judgment, the plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation for terminating her and infer that discrimination was the but-for cause of her termination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 810 (6th Cir. 2020) (citations omitted). The guiding question is "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

**A. Ms. Meyer has established her prima facie case.**

JPMC concedes that Ms. Meyer has established the first two elements of her prima facie case, but it argues that she has failed to establish the third and fourth elements. As for the third element, it argues that her termination for unsatisfactory performance shows that she was not qualified for her position. (Mot., PAGEID # 2376–77.) JPMC's argument on this point is misplaced because "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003). The third element relates to a plaintiff's objective qualifications for her position, such as her "education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576. JPMC does not argue that Ms. Meyer did not possess the objective qualifications for the job she held for more than 30 years. Ms. Meyer has satisfied the third element.

As to the fourth element, JPMC argues that Ms. Meyer cannot show that younger, similarly situated employees were treated more favorably. But a plaintiff may satisfy the fourth element by showing that she was replaced by someone at least ten years younger. *Alberty v. Columbus Twp.*, 730 F. App'x 352, 360 (6th Cir. 2018). Ms. Meyer has done so here: she was 60 years old when terminated and she was replaced by Sakshi Dave, who was 40 years old. (ECF No. 40-1, PAGEID # 871.) She has met her burden to establish a prima facie case.

**B. Ms. Meyer fails to raise a genuine dispute regarding whether JPMC's stated reason for her termination was pretext for discrimination.**

Ms. Meyer does not dispute that JPMC has met its burden to articulate a legitimate, nondiscriminatory reason for terminating her. Indeed, terminating an employee for unsatisfactory performance is legitimate grounds for termination. *See Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment[.]"). Thus, the burden shifts back to Ms. Meyer to produce sufficient evidence from which a jury could reasonably reject JPMC's explanation for its decision and infer that its stated reason was pretext for discrimination. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (citations omitted).

A plaintiff typically shows pretext by demonstrating that the proffered reasons (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action. *Miles*, 946 F.3d at 888. However, a plaintiff is not limited to these three categories and may put forth other

"evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (citation omitted). Ms. Meyer offers arguments under the second and third categories, in addition to other evidence of pretext. The Court addresses each in turn.

**1. Ms. Meyer fails to show that her infraction did not actually motivate her termination.**

To show that the employer's explanation did not actually motivate the challenged decision, a plaintiff must point to evidence that tends "to prove an illegal motivation was *more* likely" than the reason offered by the employer. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). In other words, the plaintiff argues that the "sheer weight of the circumstantial evidence of discrimination makes it more likely than not" that the employer's explanation is a "coverup" for unlawful discrimination. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 399 (6th Cir. 2008) (citation omitted).

**a. ER's Investigation and Recommendation**

Ms. Meyer first argues that the June 2021 transaction did not motivate her termination because neither ER nor GS found that she "manipulated" the TE System, and ER originally recommended a coaching and a written warning, not termination. (Resp., PAGEID # 3216.)

While Ms. Meyer is correct that GS found that the allegation that she manipulated the TE System was unsubstantiated, it also found that she violated JPMC's policy regarding accurate record keeping. She admitted to splitting a

transaction to bypass the authorization prompt and ER determined that such conduct was improper and warranted discipline. (ECF No. 40-1, PAGEID # 859.) That Ms. Muzillo's initial complaint to GS was unsubstantiated on one ground does not call into question JPCM's motive for terminating her.

Nor does the fact that ER's initial recommendations were to coach Ms. Meyer and issue a written warning create a genuine issue as to whether JPMC's stated reason for terminating Ms. Meyer was pretextual. True, "an employer's failure to follow its own internal disciplinary procedures may be probative evidence," but "more is required to create a genuine fact question on pretext." *Bailey v. Oakwood Healthcare, Inc.*, 732 F. App'x 360, 366 (6th Cir. 2018) (citations omitted). When the employer's policy reasonably supports its decision, failing to take a less drastic course of action does not create an inference that the employer's stated reasons were pretextual. *See Ploscowe v. Kadant*, 121 F. App'x 67, 76 (6th Cir. 2005); *see also Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 15 (1st Cir. 2025) ("Simply stressing that the [defendant] took a more punitive action than the one recommended … is the type of argument that merely suggests that the [defendant] could have reached a different conclusion. And that type of submission cannot show pretext.").

Ms. Meyer has not shown that JPMC deviated from its disciplinary procedures by rejecting ER's recommendation of more lenient discipline. Indeed, JPMC's corrective-action policy states that its guidelines are discretionary and that "misconduct, breach of trust, dishonesty," or other policy violations "may call for

alternate or abbreviated corrective action or immediate employment-termination" if, "in the manager's judgment, the situation calls for such action." (ECF No. 40-1, PAGEID # 848.) In her manager's judgment, termination was more appropriate here because Ms. Meyer admitted to serious and unethical misconduct.[1] Ms. Meyer has not put forth any evidence suggesting that the decision to terminate her rather than coach her or issue a written warning was "so unreasonable as to be disbelieved by a reasonable jury." *Bailey*, 732 F. App'x at 366.

**b. Lack of Policy Violation**

Ms. Meyer next argues that the June 2021 transaction could not have motivated her termination because JPMC does not have a policy against "splitting transactions" and the Delaware Branch employees had a "practice" of working "around the TE System prompt for a debit card[.]" (Resp., PAGEID ## 3219–20.) But these arguments fail to address the reason for her termination. JPMC did not terminate her for splitting a transaction or for using a workaround to process a transaction for a customer without a debit card. JPMC terminated her because she

[1] Ms. Mayer told Ms. Muzillo that termination was "risky," but Ms. Meyer overstates the relevance of this evidence. (Resp., PAGEID # 3216–17.) Ms. Mayer testified that "[w]henever a manager is skipping a step within the corrective action process … I would explain to the manager … there's some risk involved there, because you're skipping a step in the corrective action process." (Mayer Dep., PAGEID # 824.) Such generalized advisement does not mean that Ms. Mayer thought that terminating Ms. Meyer was "risky" apart from the risk posed by immediately terminating any employee, nor does it suggest that Ms. Mayer thought termination was unwarranted.

tried to split a transaction to avoid properly authenticating the customer under its policy.

Applying her arguments to the facts of the case, the lack of express policy against splitting transactions to avoid an authentication prompt does not suggest that her termination was pretextual. *See Allen*, 545 F.3d at 398 (the lack of a specific policy against the infraction does not itself create a genuine issue as to pretext). Even so, Ms. Meyer's claim that JPMC had no policy prohibiting the June 2021 transaction is incorrect. JPMC's authentication policy clearly states that customers "must be authenticated" in accordance with the policy "before processing transactions[.]" (ECF No. 38-1, PAGEID # 616.) Here, JPMC's policy offers three options for authenticating a customer without a debit card for a withdrawal over $2,000: the employee may authenticate the customer using a one-time passcode sent to the customer's mobile device, the customer may provide an acceptable primary and secondary ID, or the customer can return later with his debit card. (Authentication Policy, PAGEID ## 616–18.) Rather than using one of these approved methods, Ms. Meyer tried to avoid triggering the requested authentication by trying to do three withdrawals under $2,000. In this context, it was reasonable for JPMC to consider intentionally evading an authentication prompt to complete a transaction outside of policy guidelines as a terminable offense.

Ms. Meyer attempts to overcome this fact by arguing that she "properly authenticated" the customer "via policy appropriate identification[.]" (Resp., PAGEID # 3220). But the evidence belies this contention. When asked by GS

whether she felt that splitting the transaction to avoid additional authentication was acceptable, Ms. Meyer said that "she was only trying to help the customer since she was sure" of his identity because he "provided two forms of ID." (ECF No. 39-1, PAGEID # 738.) That the customer had two forms of ID does not mean that she authenticated the customer using policy-approved primary and secondary IDs. (*See* Reply, PAGEID # 3256 n.3.) In fact, Ms. Meyer testified that she could only remember the customer having a photo ID; she did not remember him having any other form of identification that would have been sufficient to authenticate him to withdraw $5,000 under the policy. (Pl.'s Dep., PAGEID # 171–72.) And that Ms. Meyer tried to do three withdrawals, each under $2,000, suggests that she could not properly authenticate him to take out over $2,000.

More importantly, it is undisputed that JPMC believed that Ms. Meyer tried to complete the transaction without properly authenticating the customer. (*See* Courtade Dep., PAGEID ## 708–09, 735; ECF No. 40-1, PAGEID ## 859, 884.) Whether Ms. Meyer actually authenticated the customer using policy-approved identifications before running the transactions is irrelevant without evidence to contradict that JPMC believed that she did not. *See Chen*, 580 F.3d at 401 ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'") (citation omitted). Records from the multiple investigations demonstrate that JPMC thought

that Ms. Meyer attempted the transaction without properly authenticating the customer. (*See* ECF No. 39-1, PAGEID ## 738, 745, 757.)

Ms. Meyer's arguments regarding a lack of formal policy fail.

#### 2. Ms. Meyer fails to show that her infraction was insufficient to motivate her termination.

A plaintiff can show pretext by producing evidence that similarly situated employees outside the protected class "were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated" her termination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286–87 (6th Cir. 2012) (citation modified). In evaluating whether the individuals with whom plaintiff seeks to compare her treatment are similarly situated, courts consider whether the employees dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (citation omitted). "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment," but they must be similar in all relevant aspects. *Id.*

##### a. Jessica Cheeseman

Ms. Meyer first compares herself to Ms. Cheeseman, arguing that Ms. Cheeseman engaged in the same conduct that led to her termination, in addition to engaging in other misconduct, without repercussion. (Resp., PAGEID ## 3221–23.)

Start with Ms. Meyer's claim that Ms. Cheeseman engaged in the same conduct. Ms. Meyer once saw Ms. Cheeseman split a transaction to bypass the TE

System's authentication prompt, but she is not aware of Ms. Cheeseman being disciplined for doing so. (*See* Pl.'s Dep., PAGEID # 206.) But there is no evidence that Ms. Muzillo or anyone else knew that Ms. Cheeseman split a transaction for this purpose and, without such evidence, Ms. Meyer cannot show that Ms. Cheeseman was treated more favorably for engaging in the same conduct. *See Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 513 (6th Cir. 2022) (other employee not similarly situated when there was "no evidence that [the employer] knew about any of these alleged additional violations").

Ms. Meyer next argues that Ms. Cheeseman forced balanced a vault and regularly completed schoolwork in front of customers but was not disciplined. (Resp., PAGEID ## 3223–24.) As to the former, evidence that Ms. Cheeseman forced balanced a vault offers no probative value without evidence that Ms. Muzillo knew about Ms. Cheeseman's violation but did not discipline her – evidence that Ms. Meyer again failed to provide. As to the latter, it is unclear how completing schoolwork in front of customers is comparable to intentionally bypassing authentication prompts. Ms. Meyer does not argue that these two actions are comparably serious and should be viewed similarly. That said, it seems reasonable for JPMC to treat conduct that puts the company and customers at risk for fraud more severely than completing homework in front of customers. Regardless of whether Ms. Meyer's conduct resulted in any actual harm, she could have exposed the bank to loss or liability, while doing homework in front of customers does not carry the same obvious risks.

**b. Sakshi Dave**

Ms. Meyer argues that her replacement, Sakshi Dave, also split a transaction but was not terminated. (Resp., PAGEID # 3222.) But Ms. Dave's conduct is too distinguishable from Ms. Meyer's to create a genuine issue as to pretext. Ms. Dave split a transaction because the customer requested two separate transactions, not to bypass an authentication prompt. (ECF No. 60-3, PAGEID # 3238.) Thus, Ms. Dave's split transaction is materially distinct from Ms. Meyer's split transaction. "When determining whether employees engaged in similar misconduct, we look to the 'type, circumstances, and respective severity of the misconduct alleged.'" *Hieber v. Oakland Cnty. Mich.*, 136 F.4th 308, 330 (6th Cir. 2025) (citation omitted). Although the conduct need only be "substantially identical," it must be similar in all relevant aspects. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 782 (6th Cir. 2016) (citing *Ercegovich*, 154 F.3d at 352). Ms. Dave's is not.

JPMC further distinguishes its treatment of Ms. Dave from Ms. Meyer because Ms. Dave had worked at the Delaware Branch for only "a few months before that transaction[.]" (Reply, ECF No. 61-1, PAGEID # 3257.) An employee's longer tenure can be a differentiating circumstance that accounts for differential treatment. *See Cameron v. Ohio*, 344 F. App'x 115, 119 (6th Cir. 2009) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Indeed, differences "in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004). In evaluating whether two employees are similarly situated, the

"appropriate test is to look at those factors relevant to the factual context," including whether the employees' "distinctions were in fact relevant" to the employer's decision. *Strickland v. City of Detroit*, 995 F.3d 495, 513 (6th Cir. 2021) (citation modified). Here, JPMC believed that Ms. Meyer's experience made her conduct more egregious because she had the experience to know better, while Ms. Dave was still learning the job.

Ms. Meyer has not put forth sufficient evidence that would allow a reasonable jury to conclude that JPMC's differing treatment of Ms. Dave's split transaction was a pretext for unlawful discrimination.

**c. Other Comparator Evidence**

Ms. Meyer provides additional examples of younger employees who were not disciplined for misconduct. (Resp., PAGEID ## 3224–25.) However, she primarily cites to her Complaint as support for her arguments. (*Id.*) Unverified pleadings are not evidence and they cannot be used to create a genuine dispute as to any material fact.

Turning to Ms. Meyer's only arguments based on specific evidence leaves two potential comparators: (1) a 20-year-old employee who was "late for work numerous times" during her probationary period and rarely balanced her cash drawer yet faced no discipline; and (2) Ms. Muzillo and a 32-year-old employee, who left $10,000 out for an hour when conducting an audit without consequence. (*See* Oliver Decl., ECF No. 60-1, ¶¶ 19, 23.) But Ms. Meyer develops no argument as to how these actions are comparable to intentionally circumventing authentication

prompts. That Delaware Branch employees, including Ms. Meyer, were not disciplined for every policy violation only shows that Ms. Muzillo was not quick to discipline her subordinates.

As to her evidence that younger employees were treated more favorably, Ms. Meyer points to Ms. Guthrie's statement that she had seen Ms. Muzillo "not follow the rules with some people" and Ms. Oliver's statement that Ms. Muzillo did not discipline or terminate younger employees "for violations known and allowed by [her][.]" (*See* Guthrie Dep., PAGEID # 2405; Oliver Decl. ¶ 17.) Without specific facts as to the kind of policy violations Ms. Muzillo tolerated from younger employees but not from older employees, these conclusory statements do not raise a genuine issue of pretext for trial. *See Mitchell*, 964 F.2d at 584 ("[R]umors, conclusory allegations and subjective beliefs … are wholly insufficient evidence to establish a claim of discrimination…[.]").

At bottom, Ms. Meyer challenges the wisdom of JPMC's decision to terminate her over one transaction and not terminate others for various misconduct. Whether her termination was fair or wise is not for the Court to decide. *See Lee v. City of Columbus, Ohio*, 636 F.3d 245, 256–57 (6th Cir. 2011) ("It is not within the province of the courts to … 'act as super personnel departments to second guess an employer's facially legitimate business decisions.'") (citation omitted). For the purposes of demonstrating pretext, Ms. Meyer has not identified any employee who engaged in comparable intentional conduct that JPMC considered unethical but whom JPMC did not discipline.

**3. Ms. Meyer fails to identify other evidence of pretext sufficient to undermine JPMC's proffered reason for her termination.**

Ms. Meyer's final pretext argument is that Ms. Muzillo has a "history" of age bias, evidenced by her age-related comments. (Resp., PAGEID # 3227.)

"An employer's age-related comments can raise an inference that the employer acted on ageist animus." *Smith v. City of Union, Ohio*, 144 F.4th 867, 875 (6th Cir. 2025). Courts "gauge how much weight to place on such statements" depending on the speaker's position in the employer's hierarchy and her influence over the decision, whether the statement was made during the decisionmaking process, the purpose and content of the statement, and whether the statement buttresses other evidence of pretext. *Id.*; *see also Ercegovich*, 154 F.3d at 357. "Isolated and ambiguous comments are too abstract … to support a finding of age discrimination." *Ercegovich*, 154 F.3d at 355 (citation modified).

Ms. Meyer identifies three comments that she claims demonstrate Ms. Muzillo's ageist animus: (1) Ms. Muzillo reported that Ms. Meyer had an "antiquated" view of the associate banker position; (2) she "bragged about firing an older long-term employee" at her previous job; and (3) she told other employees that she did not want to hire a job candidate because he was old. (Resp., PAGEID # 3227.) Although Ms. Muzillo was involved in the decision to terminate Ms. Meyer, none of these statements raises a triable issue regarding pretext.

First, Ms. Muzillo's statement regarding Ms. Meyer's "antiquated" view of her job (made six months before the June 2021 transaction) has no reasonable connection to her age. An employee's view of her role can be "antiquated" regardless

of her age, so this statement offers no probative value regarding Ms. Muzillo's alleged ageist bias. The context of Ms. Muzillo's statement demonstrates that she was referring to Ms. Meyer's resistance to the evolving nature of the teller position.

Regarding the second statement, Ms. Guthrie reported overhearing Ms. Muzillo brag that she got a 20-year employee at her previous job fired. (Guthrie Dep., PAGEID # 2402.) It is not clear when or in what context Ms. Muzillo made this statement. The statement's ambiguity diminishes its probative value, because it does not refer to the fired employee's age, only her tenure. Although correlated, the fact that Ms. Muzillo bragged about getting a long-tenured employee fired does not equate to her bragging about firing an older employee. *Cf. Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) ("'[Y]ears of service' is conceptually distinct from 'age.' While both terms apply to many of the same individuals in various contexts, the overlap is not perfect.").

Regarding the third statement, Ms. Oliver said that Ms. Muzillo expressed to her that a man in his "mid-40s or older" was not a "good fit for the vibe" of the Delaware Branch because he "was in the military previously, very awkward and old[.]" (Oliver Decl. ¶ 18.) It is unclear when Ms. Muzillo made this statement, but she was not discussing Ms. Meyer or her employment. Moreover, the comment only suggests that age played a role in Ms. Muzillo's decision not to hire the individual and is not the kind of unambiguously ageist comment that courts have found probative of age discrimination.

Moreover, this third statement cannot, on its own or even taken with her other statements, create a genuine issue as to pretext. A manager's isolated comments outside the decisionmaking process, without more, does not create a triable issue that the employer's stated reasons were pretextual. *See, e.g., Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 549–50 (6th Cir. 2004) ("stray statement" that "the older people should go, bring in some new blood" could not support a jury finding of pretext to mask age discrimination); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (decisionmaker's "statements or actions outside of the decisionmaking process" "cannot alone prove pretext") (en banc). Without any other basis to reasonably question JPMC's motivation for its decision, Ms. Muzillo's comments are simply too attenuated from Ms. Meyer's termination to allow a reasonable jury to find that age was the but-for cause of her termination.

* * *

In sum, Ms. Meyer has not sustained her burden to raise a genuine issue of material fact as to whether age was the but-for cause of her termination. Accordingly, JPMC is entitled to judgment in its favor.

## IV. CONCLUSION

For the reasons stated herein, JPMC's Motion for Summary Judgment (ECF No. 49) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**